Frieda H. RABKIN, Harry Lewis, Eric Emory, Alan Emory, Nancy Emory, Howard Greenwald, Werner Klugman and Samuel Kaufman, Plaintiffs,

v.

PHILIP A. HUNT CHEMICAL CORPORATION, Olin Corporation, Alfred T. Blomquist, Robert T. Zetena, John M. Henske, George J. Haufler, John R. Bonniwell, Charles J. Lanse and Stephen R. Petschek, Defendants.

Court of Chancery of Delaware, New Castle County.

Submitted: June 29, 1984.
Decided: July 3, 1984.

---

Irving Morris and Joseph A. Rosenthal, Morris & Rosenthal, P.A., Wilmington, for plaintiffs.

R. Franklin Balotti and Karen Johnson, Richards, Layton & Finger, Wilmington,

for defendants Olin Corp. and John M. Henske.

Martin P. Tully and David A. Jenkins, Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants Philip A. Hunt Chemical Corp., Alfred T. Blomquist and Robert T. Zetena.

Michael Hanrahan and Excetral K. Caldwell, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for defendants John R. Bonniwell, Charles J. Lanse, Stephen R. Petschek and George J. Haufler.

BERGER, Vice Chancellor.

These consolidated actions were brought by stockholders of Phillip A. Hunt Chemical Corporation ("Hunt") to enjoin the proposed merger of a wholly owned subsidiary of Olin Corporation ("Olin") with and into Hunt whereby the public stockholders of Hunt will receive $20 per share. Defendants, Hunt, Olin and Hunt's directors (Messrs. Bonniwell, Blomquist, Lanse, Petschek, Zetena, Haufler and Henske) moved to dismiss on various grounds shortly after the complaints were filed. Those motions were briefed and argued but not decided prior to the preliminary injunction hearing. At that hearing, defendants orally moved for summary judgment on the same grounds advanced in their original motions to dismiss. Plaintiffs oppose summary judgment on the ground that there are material issues of fact in dispute. At the end of the day on the date of the preliminary injunction hearing, plaintiffs filed a motion for leave to file an amended complaint. That motion has not been briefed or argued. For the reasons discussed hereafter, plaintiffs' motions for a preliminary injunction and to amend their complaints are denied and defendants' motion to dismiss is granted.

## I.

Hunt is a Delaware corporation whose business includes the developing and marketing of imaging chemicals for the photographic, graphic arts, micro-electronics and electro-static industries. Hunt has 5,688,-470 shares outstanding which are traded on the New York and Midwest Stock Exchanges. Olin is a Virginia corporation in the business of manufacturing chemicals, metal, paper and cellophane products and ammunition. On March 1, 1983, Olin acquired 63.4% of the outstanding common stock of Hunt. At present Olin owns approximately 64% of Hunt's common stock and three of its top executives are on Hunt's nine member Board of Directors. Two of the remaining four Hunt directors hold management positions with the company.

Olin purchased its majority interest in Hunt from Turner & Newall Industries, Inc. ("Turner & Newall") pursuant to a Stock Purchase Agreement (the "Agreement") dated December 27, 1982. The Agreement provided that Olin would purchase all of the Hunt stock owned by Turner & Newall—63.4% of the Hunt common stock outstanding—for approximately $25 per share. In addition, Olin agreed that if it or an affiliate were to acquire all or substantially all of the remaining Hunt common stock within one year of the closing date, Olin would pay the equivalent of at least the net purchase price per share (approximately $25) (the "one year commitment"). The closing date was March 1, 1984.

Olin outlined the terms of the Agreement in a Schedule 13D filed with the Securities and Exchange Commission on January 6, 1983. After describing the one year commitment, the Olin Schedule 13D stated:

> If the remaining equity interest in [Hunt] is acquired after such year, the per share consideration paid in any such transaction may be greater or less than the net purchase price per share of Common Stock pursuant to the Agreement, depending upon developments with respect to the business of [Hunt] and general economic and other conditions existing at the time of such transaction.

It is apparent that, from the outset, Olin anticipated that it would eventually acquire

the minority interest in Hunt. Olin's chief executive officer expected as much when the Agreement was executed and, in evaluating the Agreement, Olin prepared computations based upon the assumption that it would acquire 100% of Hunt. However, for the first six months after the closing date Olin gave no consideration to the acquisition of Hunt's minority shares. In September, 1983 a memorandum listing the pros and cons of such an acquisition was circulated to the three Olin officers on Hunt's Board of Directors. As against the numerous benefits to be derived from taking action immediately, the memorandum identified, among others, the disadvantage that Olin would be obligated to pay $25 per share whereas after March 1, 1984 it could acquire the minority at a lower price. In the memorandum, the figure used as an example was $21.50 per share. Olin decided to do nothing at that time.

Shortly before the expiration of the one year commitment, Olin began taking steps to acquire the minority interest in Hunt. On February 23, 1984, the Olin Board gave its Finance Committee the power to authorize the acquisition. On March 23, 1984 Olin's senior management requested Olin's investment bankers, Morgan Lewis Githens & Ahn, Inc. ("Morgan Lewis"), to provide a fairness opinion for a proposed acquisition of the minority interest in Hunt at $20 per share. Four days later, Morgan Lewis opined that $20 per share is fair to the minority stockholders of Hunt from a financial point of view. On the same day, Olin's Finance Committee approved the proposed acquisition and Olin's chairman telephoned his counterpart at Hunt to advise him of the cash merger proposal. The next day the two companies issued a joint press release announcing Olin's intention to acquire Hunt's publicly held stock through a $20 per share cash merger.

Hunt's Board of Directors immediately appointed a Special Committee of its outside directors to consider the Olin proposal. The Special Committee retained independent investment bankers and attorneys to evaluate the proposal. Approximately one month later the Special Committee met with plaintiffs' counsel to discuss the allegations in these complaints (which had been filed within days after the public announcement at the end of March). The Special Committee also met with its investment bankers on that day and was told that a range between $19 and $25 per share would be fair to Hunt's minority stockholders. Based upon that opinion, the Special Committee recommended that Olin consider raising its price. Olin declined and a few days later the Special Committee recommended approval of the merger proposal at $20 per share.

The Hunt Board unanimously approved the merger proposal on May 15, 1984 and issued a proxy statement on June 7, 1984. Olin will vote its 64% of Hunt's common stock in favor of the merger. The merger agreement does not provide for a majority of the minority vote. Thus, absent court intervention, the merger will be approved at the special stockholders' meeting scheduled to be held on July 5, 1984 and effectuated promptly thereafter.

## II.

Of the four complaints in these consolidated actions, two are virtually identical to the complaint filed by Frieda H. Rabkin and Harry Lewis and will be discussed collectively as the "Rabkin Complaint." The remaining action filed by Eric, Allan and Nancy Emory (the "Emory Complaint") appears to advance a slightly different legal theory and will be discussed separately where necessary. The gravamen of all the complaints appears to be that the cash-out price is unfair. For example, Rabkin alleges that the merger was a preconceived fraudulent scheme which will "wrongfully deprive [Hunt's public stockholders] ... of their investment ... for a grossly inadequate consideration..." (¶ 16); the sole purpose of the merger is to obtain the minority interest "for a fraudulently low and unfair price...." (¶ 17); the "intrinsic value of the common stock of

Hunt is materially in excess of $20 per share...." (¶ 22); and the merger price "is grossly inadequate because it does not give adequate recognition to Hunt's business and future prospects...." (¶ 23) and because it "violates Olin's promise" in its Schedule 13D as to the price that would be paid after March 1, 1984 (¶ 26). In support of these allegations as to price, Rabkin alleges that Hunt's fourth quarter 1983 earnings from continued operations were three times greater than those reported for the same period in 1982; its profit margin has shown a "significant upward trend" during 1982 and 1983; and Hunt has been expanding its manufacturing and distribution facilities and its market base in recent years.

The Rabkin Complaint also alleges that Olin and its directors knew, long before the expiration of the one year commitment, that it would acquire the minority interest in Hunt. Rabkin alleges that the failure to announce this intention prior to March 1, 1984, Olin's intentional timing of the merger immediately after the expiration of the one year commitment and the absence of arms length negotiations constitute a breach of fiduciary duty.

The Emory Complaint parallels the Rabkin Complaint with respect to the allegations of unfair price and the facts alleged as to Hunt's improved earnings and general business prospects. However, Emory specifically alleges that the statement made in Olin's Schedule 13D, quoted above, constitutes a price commitment and that Olin has failed to abide by that "price commitment." In short, Emory alleges that the Schedule 13D language forms the basis of a promissory estoppel claim and that Hunt's public stockholders are third party beneficiaries entitled to enforce the "price commitment."

## III.

■ In deciding defendants' motions to dismiss for failure to state a claim, the test is whether it appears with reasonable certainty that, under any set of facts which could be proved to support the claim, plaintiff would not be entitled to relief. *Fish Engineering Corporation v. Hutchinson,* Del. Ch., 162 A.2d 722 (1960). All well pleaded factual allegations must be accepted as true, although legal conclusions and unsupported factual conclusions are not deemed admitted. *Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262 (1979). The complaints purport to allege three claims based upon the pending cash-out merger— breach of the fiduciary duty of entire fairness, breach of fiduciary duty under *Schnell v. Chris-Craft Industries,* Del. Supr., 285 A.2d 437 (1971) and promissory estoppel. Each will be discussed in turn.

The viability of plaintiffs' entire fairness claim turns upon whether, following *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983), appraisal is an adequate remedy for plaintiffs under the facts alleged. In *Weinberger* the Delaware Supreme Court expanded the remedy available through appraisal and limited the circumstances under which a stockholder may attack a cash-out merger through an entire fairness claim:

> ... [t]he provisions of 8 *Del.C.* § 262, as herein construed, ... shall govern the financial remedy available to minority shareholders in a cash-out merger. Thus, we return to the well-established principles of *Stauffer v. Standard Brands, Inc.,* Del.Supr., 187 A.2d 78 (1962) and *David J. Greene & Co. v. Schenley Industries, Inc.,* Del. Ch., 281 A.2d 30 (1971) mandating a stockholders' recourse to the basic remedy of an appraisal.

*Id.* at 715.

Traditional equitable remedies remain available to plaintiffs after *Weinberger* in those cases where appraisal would not provide adequate relief:

> While a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate.

The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. *Cole v. National Cash Credit Association*, Del.Ch., 156 A. 183, 187 (1931).

*Id.* at 714.

■ *Stauffer* and *Schenley* squarely stand for the proposition that, absent fraud, appraisal is the minority stockholders' exclusive remedy. It is noteworthy that in *Stauffer* the complaint was dismissed notwithstanding the fact that it contained "conclusory allegations of oppressive treatment of the minority by the parent corporation" and alleged that the real value of the stock in question was at least $150 or $160 a share as compared to the $105 cash-out price. *Stauffer v. Standard Brands, Inc.*, Del.Supr., 187 A.2d 78, 80 (1962). Similarly, in *Schenley*, the court denied a preliminary injunction finding that plaintiffs' relief "clearly lies in an appraisal proceeding" despite the fact that the majority stockholder had engaged in self-dealing. *David J. Greene & Co. v. Schenley Industries, Inc.*, Del.Ch., 281 A.2d 30, 33 and 36 (1971).

■ The discussion of entire fairness in *Weinberger* confirms the conclusions reached in *Stauffer* and *Schenley* that appraisal may be an adequate remedy even where there are allegations of unfair dealing:

> ... [T]he test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness. However, in a non-fraudulent transaction, we recognize that price may be the preponderant consideration outweighing other features of the merger.

*Weinberger v. UOP, Inc., supra* at 711. In *Weinberger*, the Court found evidence of both unfair dealing and unfair price and stated that "a primary issue mandating reversal" was the non-disclosure of a feasibility study indicating that the merger would have been a good investment for the parent company at a price higher than what was offered.

Plaintiffs' complaints, read against this legal framework, do not allege facts which, if true, would render appraisal an inadequate remedy. First, plaintiffs' insistence that this is not a fair price case is contradicted by the allegations in their complaints. The vast majority of the substantive allegations are directed to the issue of fair price and I conclude that that aspect of entire fairness is the preponderant consideration in this case.

■ Second, plaintiffs are not precluded from obtaining relief for the alleged unfair dealing through appraisal. Plaintiffs allege that the merger was purposely timed to avoid the one year commitment and that the merger price was not negotiated at arms length. Significantly, the complaints do not allege any non-disclosures or misrepresentations in connection with the transaction. Thus, all of the minority stockholders of Hunt presumably are fully informed. If they conclude, based upon the absence of negotiations, for example, that the offered price is less than fair value, they will be free to pursue their appraisal remedy. Moreover, under the newly expanded appraisal proceeding, all relevant factors including damages, where appropriate, are to be considered in determining fair value. *Weinberger v. UOP, Inc., supra* at 713. If plaintiffs are able to establish that they were damaged by the alleged unfair dealing, those damages could be included in the appraisal award.

■ In brief, the issue is not whether defendants still have a duty to treat the minority with entire fairness. They do. The issue is the nature of the remedy available for an alleged breach of that duty. Where, as here, there are no allegations of non-disclosures or misrepresentations, *Weinberger* mandates that plaintiffs' entire fairness claims be determined in an appraisal proceeding.

Plaintiffs also contend that Olin breached its fiduciary duty by manipulating the timing of the merger for an inequitable purpose. The complaints allege that Olin formed an intention to acquire the minority interest in Hunt prior to the expiration of the one year commitment but deliberately waited until after March 1, 1984 for the sole purpose of avoiding its contractual obligation to pay $25 per share. Relying upon *Schnell v. Chris-Craft Industries*, Del.Supr., 285 A.2d 437 (1971), plaintiffs argue that these allegations, taken, as true, state a claim for breach of fiduciary duty. In *Schnell*, the Supreme Court held that it was a breach of fiduciary duty for management to move up the date of a stockholders' meeting for the improper purpose of perpetuating itself in office even though the action taken was legally permissible.

The rule announced in *Schnell* does not apply to the facts alleged in these complaints. Olin has not impaired or infringed upon any rights of the minority stockholders by waiting until the expiration of the one year commitment before proposing the merger. This is so because Hunt's minority stockholders had no right to be cashed-out during that one year period. From March 1, 1983 to February 29, 1984 Olin had a contractual obligation to pay the minority the equivalent of $25 per share even if the fair value of their stock was less than $25 per share. Olin was under no fiduciary duty to act within that year, and after that year Olin's fiduciary duties were no different than those of any majority stockholder. I do not find it to be an improper purpose under *Schnell* for Olin to have waited until it was free of its contractual commitment in order to save itself a substantial sum of money.

As noted earlier, the complaints also appear to assert a promissory estoppel claim. This theory is based upon the previously quoted Schedule 13D language wherein Olin stated that, after the one year commitment, it would pay more or less than $25 per share "depending upon developments with respect to the business of [Hunt] and general economic and other conditions existing at the time of such transaction." Plaintiffs allege that the $20 per share price being offered does not live up to this "commitment."

In order to state a claim for promissory estoppel, plaintiff must allege (i) the making of a promise; (ii) with the intent to induce action or forbearance based on the promise; (iii) reliance; and (iv) injury. *Scott-Douglas Corp. v. Greyhound Corp.*, Del.Super., 304 A.2d 309, 319 (1973). Plaintiffs' promissory estoppel claim fails for either of two reasons. First, the Schedule 13D language is too indefinite to constitute a promise. *See Santoni v. FDIC*, 677 F.2d 174 (1st Cir.1982). Olin stated that the price it would pay would depend upon Hunt's business, general economic conditions and "other conditions." This last catch-all phrase is too vague and indefinite to form the basis of a promise. Alternatively, the Schedule 13D language, read as a whole, may fairly be interpreted to be a restatement of Olin's fiduciary duty to pay the minority stockholders of Hunt a fair price. Estoppel cannot be predicated upon a promise to do that which the promisor is already obliged to do. *Danby v. Osteopathic Association of Delaware*, Del.Super., 104 A.2d 903 (1954).

In sum, I conclude that the complaints fail to state claims upon which relief may be granted. Having determined that defendants' motions to dismiss should be granted on this ground, it becomes unnecessary to consider the other grounds for dismissal advanced by defendants.

IV.

Plaintiffs' motion for a preliminary injunction must be denied in part for the reasons discussed in connection with the motions to dismiss. The evidence adduced by plaintiffs through discovery fails to demonstrate a probability of success on the merits. At best, that evidence merely fleshes out some of the allegations in plaintiffs' complaints. Inasmuch as I have held

that the complaints fail to state a claim, it follows that preliminary injunctive relief must be denied. In addition, plaintiffs failed to establish that they would suffer irreparable harm. They acknowledge that the minority stockholders of Hunt have no right to continued equity participation in the company. Thus, absent fraud or misrepresentations (neither of which have been alleged or demonstrated by the evidence), monetary relief will compensate plaintiffs for any injuries sustained.

### V.

■ Finally, plaintiffs moved for leave to file an amended complaint at the end of the day following the preliminary injunction hearing. The proposed Amended and Supplemental Class Action Complaint does not allege any new legal theories and only adds more factual detail to the claims set forth in the original complaints. Although amendments are generally freely granted, motions to amend may be denied where, on the face of the pleading, it is clear that the amended complaint would be subject to dismissal. *Itek Corp. v. Chicago Aerial Industries, Inc.*, Del.Super., 257 A.2d 232 (1969). I do not see where any purpose would be served to rebrief and reargue the same facts and law presented to the Court in connection with the original motions to dismiss and the preliminary injunction hearing. Accordingly, plaintiffs' motion for leave to amend is denied.

I request that defendants submit a proposed form of order, on notice, in accordance with this decision.